We have four arguing cases this morning. The first is number 24, 1828, MCom IP versus HSBC Bank. Good morning, your honors. Bill Ramey for the appellant MCom IP, LLC. If it pleases the court, may I begin? Go ahead. Your honor, this case was dismissed because the district court required MCom to prove infringement at the pleading stage. Contrary to rule 12b-6, contrary to Twombly, Iqbal, and this court's precedent, especially in BOT M8 and DIS disease. This court reviews de novo whether the complaint plausibly alleges infringement, accepting all factual allegations as true, and draw reasonable inferences in favor of the plaintiff. The district court did the opposite. It rejected reasonable inferences, it resolved factual disputes, and it required evidentiary proof in technical detail. That is the core reversible error. We'll start with what the district court said we didn't do. It says that we didn't identify a product. Well, the first submitted complaint expressly identifies as the HSBC digital banking platform. It provides us... Is that a product? Yes, your honor. It is when we provide a specific website address that references www.us.hsbc.com and then provides that website. It links you to specific functionality of a product they offer. They say that that is their online services and goes on for that. And then we provide other additional screenshots on that platform showing the core functionality that's within our claim. So yes, we would assume or we would assert that is a product that's capable of infringement. They're advertising to the world that that's their digital banking platform and it has certain functionality. And that's what we've accused infringement by matching up with detailed claim shots and an explanation of why we allege those claim shots suffice for those elements, why we map up. Where did you allege? Yes, your honor. If you go to appendix page 187 for claim 17. Get that open here real quick, sir, your honor. If we go to the appendix page 0187, we have claim 17 there and it talks about a system with common control. We reference, again, the HSBC Bank USA digital banking platform and we talk about how the unified banking environment, digital banking allows for different touch points or endpoints such as mobile. The user, perhaps the user having a common point of control. Where does it allege that the bank has a common point of control? And that's what this system is. So this is the common point of control between the user and the bank is going through this website. That's the common point of control that we would allege is being shown by our screen shots. Going back, if you go to the common point of control for claim 17 and you go through the claims, like walk through the claim charges if the court would like, and I think maybe that might be the best way to do it, your honor, is if we start with what we started the preamble, and that's at appendix page 177. We explain how we are alleging that the HSBC Bank USA digital banking platform provides that common point of control. That is the control for all their systems. And that provides access, if you go through a unified banking environment, digital banking, it allows different touch points or endpoints such as mobile banking and online banking to access the same banking information with a single login. Okay, can I just ask you about, I think Judge Dyke asked you about the common control point, which is the element that claim 17 adds to claim 13. Is that the independent claim? If I understood you correctly, yes, your honor. Claim 13 was invalidated in Pete's appearance. So as I recall things there, and you'll correct me, the district court said you had three problems. One was the common control point element. One was you didn't point more generally to a specific component of HSBC's banking system. But like the common control point, there was one more specific element, the real-time element, which is a dual element, real-time monitoring and transmission during a session. Where do you point to something specific about the transmission during a session? And I guess what I'm remembering, and again, you can correct me, is that the problem the district court had with that was that you point to cookies that HSBC will place on the computer and some kind of description by HSBC of cookies, which seems to focus on what will happen the next time that same user starts a session, doesn't seem to suggest to cross the Twombly threshold into plausibility of using it during the same session. That's the one I want you to focus on. Yes, your honor. Thank you for that. So let's go into the real-time targeted marketing, I guess, is the best way that we've kind of summarized those two points about... But they might really be different, right? Real-time monitoring may take place during the session, of course, but it's that second piece, looking, saying, oh, this customer warrants me sending something additional. Yes, your honor. That's the part that... Yes, sir. So let's go through those three things we've alleged that are within the privacy banner of the HSBC website that suffices for these claim elements, your honor. And the cookies do two things. They track interest and they collect information, and that can be found on each of the pages from 183 to 187, and we have it underlined in there on each page that we can read through there. And then there's the second thing of these log files that track interest in specific promotions, and that's 185 to 187, your honor. Where's the marketing? Pardon me? Where's the real-time marketing? And so the behavioral advertising, that real-time marketing, is you select an advertiser that matches your interest, is 184 to 185. And I'm... I can... So if we go back to the real-time marketing, it's if you go to, your honor, to page 184, it talks about, you know, your log files together, statistics about your browsing habits, and this is right in the second paragraph down, to track interest in specific promotions and give you content that might be of interest. So this is right on... It certainly suggests that there can be marketing, but where does it say real-time marketing? Yes, your honor. So what we would allege is the district court read a reasonable inference against this. I think one reasonable inference is that it's present tense marketing for future content, but the other... I mean, it's marketing for future visits there from past interactions. But another reasonable inference is, because it uses present tense, that it is real-time marketing, and that's what we would allege from the behavioral advertising. The present tense... Where do you allege that that's the inference that should be taken from that? Well, because we allege in the pages on page 180 and 183 through 186, when you use or visit, and during their visit, that language is in each of those pages, and so that connotes a present tense impression. That's a very reasonable inference, is that that's a present tense marketing. That's happening in real-time right there from 180, 183 to 186. If this... And if you... For the court to draw... For the district court to have said that that's only based on past interactions, that actually is reading a reasonable inference out of the claim language, and that's what we would say on that one. So we have alleged, we thought very specifically in 183 to 186, that when you use or visit, that's real-time. And that's our answer for that, Your Honors. The... In amendment, the complaint supports a reasonable inference of real-time monitoring and targeting that, and that should end the Rule 12 inquiry at this point. I mean, right now, where this is before evidence, we've done what we can with what's publicly available to make the court... To provide to the defendant what we could. When we went back, when we did the first amended complaint, Your Honors, we went... We really tried to give... You're not supposed to make the inference. Are you supposed to allege the inference, or is the district court supposed to make the inference for you? We alleged by underlining, highlighting, explaining what we were... No, answer my question. Okay. We're supposed to tell the district court what the reasonable inference is. Okay, but where did you? Okay, yes, Your Honor. So for the real-time marketing, if you go on to what is page... I think it was 184. Let me go back down there, Your Honor. 184, we specifically say, on the... To the left of the... To the right of the claim language, is the subsequent said monitoring selecting real-time said targeted marketing content correlated to said user-defined preferences. Then we have put a box to the right of that, Your Honor. We explained that the HSBC Bank USA monitors customers in real-time by using cookies. And then we say the inference... It places those cookies on customers' devices to see what the customer is interested in by looking at websites they visit. And then we correlate our advertising to that. And we specifically state that inference in that box to the right. And then we don't stop there. We provide below there evidence from HSBC's own website of where we get that inference from. So we tried to do that. And this continues on to page 183, 184, 185, and 186, all addressing this core issue that Judge Toronto brought up. It's about how the real-time marketing happens now, and it monitors as you go forward. And that's what we tried to put our best foot forward for this inference. And we would say, though, just at a minimum, though, to draw a different inference would be reading out a reasonable inference. So we'd say that we've satisfied the Rule 12 and that the evidence discovery will show whether or not our reasonable inference does suffice. If you go to the appendix, page 187, that we'd say that the First Amendment complaint does show a unified login system, shared navigation across the devices, and essential access to the banking. That should be the reasonable inference for the common point of control we were talking about. That gets us to that other point that we were on. From the user's point of view, that's a single login menu to access all the functionality on the bank side, a single menu for navigation from all the functionality that they provide. And so we think that is a reasonable inference. But isn't, I guess I took it that the district court, as to that language, when it said what you have pointed to is a user's ability to use your current language to access a bunch of different functionality. But that's not the same as a control point, a common point to control the functionality. Yes, correct, Your Honor. And so what we tried to say is that we're accessing all the functionality at that one site. So it's that system, it's that unified banking, HSBC's digital banking platform that is that common point of control. It's their online presentation. It's that offering to the customer that is that unitary control. The customer is able to access it through that unified login. But that is the centralized banking system too. And that's what we alleged as we did. There's, at this point, we think that's a reasonable inference. And that's all we need at the 12B6 stage. I'm in my reserved time. So the district court is in essence, Your Honor, we think requiring back-end detail to show a common point of control. We think we've alleged by showing there's a unified point to access the system and then a unified point for all this activity is occurring. And that's the common point of control, that digital banking platform. And that's what we've tried to do. The district court, in essence, did resolve through claim construction real time. And then we think it performed somewhat of an infringement analysis beyond what it needed to, beyond what the pleading standard allows. And then it weighed competing factual interpretations or allegations of what is a reasonable inference for these different terms. It didn't test plausibility. It adjudicated on the merits. Yes, I will. I would just say that a minimum of the judgment should be vacated, remanded with leave to amend. And I'll reserve the rest of my time, Your Honor. Thank you. Reshma Goguneni. Good morning, Your Honors. May it please the court. My name is Reshma Goguneni and I'm here on behalf of defendant Peli HSBC Bank. There are three independent bases for this court to dismiss MCOM's complaint. First, and crucially, MCOM failed to allege facts relating to the common point of control limitation of Claim 17, which is the only limitation that distinguishes it from Claim 13. Second, MCOM also failed to plausibly allege key claim limitations of Claim 13 regarding providing of targeted marketing content in real time and during a user's active session, instead pleading facts that facially cannot support its allegations. And finally, MCOM failed to adequately identify an accused product that HSBC actually provides and that as a system satisfies the limitations of Claim 17. Because of any of these three reasons, MCOM's amended complaint should be dismissed with prejudice in light of MCOM's failure to plausibly plead infringement despite being afforded an opportunity to amend its complaint to amend the very issues that were before it. First, with respect to the common point of control limitation, MCOM fails to plead any facts directed at this single limitation. That so I take it that what the district court, I think, agreed that MCOM did say on that point was this essentially the screen to the user provides common access to all the functionality and the district court said, well, that's the user. And I think MCOM says, well, this is a two-party, there are two parties on opposite sides of that screen, the user and the bank. So if the user has access to all of the functionality through that single screen, whoever is standing behind the screen, namely the bank, has control over it. Why is that not sufficient? Your Honor, we submit that that's a misreading of what Claim 17 actually requires. And turning to page 29 of MCOM's brief, it screenshots the portion of its claim chart relating to Claim 17's additional limitation. And Claim 17 specifically states that the system of Claim 13 provide one or more financial institutions with a common point of control, not the user as MCOM stated today. Right. Let me just try to make my point in, I don't know, more simple terms. There's somebody in front of the screen, the user. There's somebody behind the screen, a financial institution, namely HSBC. Why doesn't that single screen provide, behind the screen side, the common point of control that it provides on the front of the screen for access to all the functionality? Well, Your Honor, again, the claim specifically requires pleading what HSBC has access to. If it were MCOM's position that allowing a user a login menu automatically means that HSBC must have a common point of control, it could have said that. It could have provided that explanation in its claim chart and it didn't do so. Nor is that a reasonable inference because that would essentially conflate the scope of Claim 17 here, which necessarily needs to add something more beyond what Claim 13 has to offer. And Claim 13 already requires a unified banking system and provides specific limitations as to what the user has access to. But does Claim 13 provide a single interface for all of those things to the user? It does not. While it does not specifically recite a single interface, it does state that the unified banking system consists of various touch points of control and it is through those touch points that real-time targeted marketing is provided to the user. So it does refer to things that the user has access to, whereas Claim 17 adds this additional limitation of the banking financial institution itself exercising on the back end a common point of control over those various touch points. And here, MCOM has failed to allege anything as to what HSBC itself is doing. It's, again, only pointing to this single login menu or how the user is navigating HSBC's various services. And moreover, beyond the common point of control limitation, Claim 13 also requires that targeted marketing content be provided in real time. I'm trying to understand this a little better. I think what Judge Serrano is asking you is whether if the user has a common point of control, that that necessarily means that the bank, in responding to the user, is exercising a common point of control. And I guess my question is, is the bank's response to the user the common point of control or does the common point of control require something more from the bank than a common unified response to the user? Yes, Your Honor, it does require something more. If we were to look at the patent itself in explaining what the common point of control is, for example, the patent refers to Figure 3 and it refers to the bank representative having access to a computer console whereby it has access to various forms of data that are being received from the various touch points. And through using that console, the bank can provide real-time targeted marketing content to the user. With respect to the single login menu that the user has access to, it's very possible, hypothetically speaking, that if the user were using the login menu, all that is happening in the back end is the user is being redirected to different parts of HSBC services. That doesn't suggest a common point of control on the bank's end with respect to, for example, providing the real-time targeted marketing content. Sorry, and just to complete the point, and because that doesn't suggest it, there would need to be an explanation or an assertion that it is plausible that that is, in fact, what's happening. And that's neither in the complaint where probably it doesn't need to be, but it would need to be in the response to the 12b6 motion. Yes, Your Honor, that's correct. And with respect to the real-time limitation of Claim 13, again, the Claim 13 requires more than just monitoring of the user's active session, which is all that MCOM is pointing to when it refers to HSBC's cookie policy or the online privacy statement. It requires selecting and transmitting the targeted marketing content in real-time. And the word real-time is never used in the cookie policy, nor does MCOM explain why the statements that it's underlining in the cookie policy or the online privacy statement suggest a reasonable inference that the marketing content is being provided in real-time. Instead, what the cookie policy shows is that, like most other websites, HSBC is collecting user data to enhance user experience. And the cookie policy explicitly states that the user experience that's being enhanced is that relating to future visits, not a user's current active session. And that's not real-time targeted marketing. In fact, it's exactly the opposite. The portions of these disclosures that MCOM relies on facially cannot support its allegations. And under this Court's own precedent, when a plaintiff's own cited materials cannot facially support its dismissal is appropriate. And these issues are only compounded at the very threshold by MCOM's failure to identify what HSBC... Can I ask one question? So in Claim 13, there's the big where-in clause begins with where-in said active session. What's the antecedent for that? Your Honor, before that specific paragraph of Claim 13, Claim 13 does talk about user transactional data being collected in the paragraph right before. So it's our understanding that when that paragraph is referring to said active session, it's referring to the session in which the transactional usage data is being collected from the users. Nobody has made an issue about that here? No. Correct, Your Honor. And again, MCOM has failed to accuse any sort of product that actually meets each of those various limitations of Claim 13. Instead, what it has done is point to a single landing page on HSBC's website, a page titled Ways to Bank, and it has coined the term HSBC Digital Banking Platform. And it's a term that HSBC itself does not use. It's not an end product that HSBC actually provides to the customer. And MCOM doesn't actually define or point to which amongst the many, many HSBC banking services it is saying qualifies as this digital banking platform. And these are exactly the type of allegations that the Court has previously rejected when it comes to identifying an accused product with sufficient specificity to put the defendant on notice of... So the Claim 13, the opening phrase is a unified electronic banking system, and that system has to have some parts. Why isn't HSBC on the screen saying, here's electronic banking, that's enough, as long as it does those things? The HSBC system for electronic banking, clearly there is such a thing, even though it has many parts. Why is more detail required than that? Well, Your Honor, the claim does go on to say that the electronic banking system consists of various e-banking touch points. And what's unclear here is that MCOM points to the Ways to Bank page. It refers very generically to HSBC's online banking and doesn't necessarily even limit what it's alleging to just that. And that Ways to Bank page includes many, many different services that are even... But you keep switching from system to services, and this whole business about specifying a particular product, I'm not sure that's really in the claim. As long as there is a system that does the various things that are then at least the... Why isn't that enough? Well, Your Honor, MCOM has not actually explained what that system is. What are the contours of that system? So... Why does it have to? I mean, it doesn't have to specify contours or components. It only has to say, there is an electronic banking system for HSBC, which is more than plausible, and that it does these things. Yes, Your Honor, except MCOM has not actually done that. All it has done is that it has stated that HSBC provides online banking services. And it has, without explaining which amongst those services it's qualifying as a system that actually meets any those claim limitations. It has generically on one end stated that HSBC provides these various services, and that maybe it has a unified banking system, but that it doesn't go on to state because it has failed to show what actually is encompassed within that system, how that system actually satisfies each of the claim limitations that thereafter follow in Claim 13. And MCOM has also referred to cases like dysdysease to explain why it's sufficient complaint satisfies the plausibility standard. But the facts of those cases are very different from the ones at issue here. In dysdysease, the plaintiff did identify discrete finished devices that it had put on the market, and the plaintiff had submitted pictures of those finished products which facially map on to the asserted claims there. This is not an instance where those same types of facts are issued here. Here, MCOM has failed to identify either by name the accused product, and it's not facially clear from the screenshots that MCOM keeps referring back to what it is in those screenshots actually plausibly raise an inference of infringement in this case. And to conclude, this case is about pleading standards. MCOM has repeatedly tried to make this appeal about proof, but that is simply another attempt by MCOM to deflect and address issues that it wants to address rather than those that were before it. HSBC filed its initial motion to dismiss. It put MCOM on notice of the specific deficiencies in its complaint, and MCOM chose to in that amended complaint, and nor has it to date explained what additional facts it would plead to actually cure those deficiencies. And for those reasons, unless this court has any additional questions, we respectfully submit that the district court's judgment should be affirmed. Thank you. Thank you, Mr. Wright. Yes, Your Honor. Thank you. And briefly, I wanted to go back and better address the common point of control argument. The Claim 17 is dependent from Claim 13. And if you go back to the appendix page 180, we talk about the contours of the common point of control more in Claim 13 than we refer to it to how it's communicating across to the user through Claim 17. So here we do, in fact, talk about the HCBC Bank USA digital banking platform communicatively couples digital apps and financial institutions with their multichannel server, use a computer configured with at least one control console. This is our allegation. This is our inference. And then we go on and provide more detail of the inference of the common point of control within the HBC. This goes on to the next page. And we talk about this all through 184, 185, 186. And then when we get to Claim 17, we reference back to that saying, this is how the user is communicating with it. This is that common point of control. So exactly what Judge Toronto is bringing up, what we allege, this is how we allege. We tried to draw that reasonable inference by showing exactly what we are alleging. We would say here that uniquely this is a case out of the Southern District of New York where Judge Cote gave us a chance to amend. We took the chance. But we hadn't had any district court saying what was deficient. We had took the defendant's letter to us, tried to address everything in there. We even put Judge Albright's ruling on the 101 motion saying that it was patentable subject matter eligible at step one and put that into the first amendment complaint. So we would just say that if the court, if this court thinks that there needs to be additional details provided for a reasonable inference, that we'd be allowed the chance to amend because there is a clear path. We did tell the district court we requested that and believed to amend in response to their motion to dismiss. And with that, we'd ask that the court give us a chance to amend or just outright reverse the district court's dismissals in the case back for trial. Okay, thank you. Thank you, Your Honor. Thank you, counsel. The case is submitted.